UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES OF AMERICA                    PLAINTIFF

v.                          CASE NO. 2:20-CR-20015

JASON D'JUAN GARFIELD                        DEFENDANT

------------------------------------------------------------

SENTENCING HEARING

MAY 26, 2021

BEFORE THE HONORABLE P.K. HOLMES, III

UNITED STATES DISTRICT JUDGE

FORT SMITH, ARKANSAS

------------------------------------------------------------

A P P E A R A N C E S

FOR THE PLAINTIFF:

MR. AARON LANCE JENNEN
United States Attorney's Office
35 East Mountain, #516
Fort Smith, Arkansas 72701
(479) 521-6170
aaron.jennen@usdoj.gov

FOR THE DEFENDANT:

MR. JAMES B. PIERCE
Office of the Federal Public Defender
Judge Isaac C. Parker Federal Building
30 South 6th Street, Room 205
Fort Smith, Arkansas 72901
(479) 782-1097
james_pierce@fd.org

Paula Barden, RPR, RMR, Federal Official Court Reporter
35 East Mountain Street, Fayetteville, Arkansas 72701

1          THE COURT:  We're here this morning for a

2    sentencing matter in the United States versus Jason D'Juan

3    Garfield, Case Number 2:20-CR-20015-001.

4          The defendant is present with his attorney,

5    Mr. James Pierce.  The government is represented by

6    Assistant United States Attorney Aaron Jennen.

7          Parties ready to proceed?

8          MR. JENNEN:  Yes, Your Honor.

9          MR. PIERCE:  Yes, Your Honor.

10         THE COURT:  Mr. Jennen, you can take your mask

11   off.

12         MR. JENNEN:  Thank you, Your Honor.

13         THE COURT:  I'll just tell the folks in the

14   courtroom, there's going to be a new order entered today, a

15   new administrative order by Judge Hickey, who is the Chief

16   Judge, regarding the wearing of masks.  And basically just

17   to briefly summarize that particular order, it's going to

18   say that individuals who have been vaccinated do not have

19   to wear a mask in the courthouse.  Social distancing,

20   though, is still going to be required.

21         And then secondly, if a person has not been

22   vaccinated or chooses not to answer the question whether or

23   not they have been vaccinated will have to wear a mask.

24   And that's the policy that we will have.

25         So, Mr. Pierce, I'll allow Mr. Garfield to take

1  his mask off because he will need to testify as well.

2          Again, the government is ready to proceed?

3          MR. JENNEN:  Yes, Your Honor.

4          THE COURT:  Defendant ready to proceed?

5          MR. PIERCE:  Yes, Your Honor.

6          THE COURT:  Okay.  I'm first going to state the

7  procedural history of this case.

8          Mr. Garfield was originally arrested on a

9  criminal complaint.  The parties entered into a plea

10 agreement by which Mr. Garfield would waive indictment and

11 plead to an information.  However, the Court was unable to

12 set a waiver of indictment/change of plea hearing before

13 the Grand Jury convened, so the government presented the

14 case to the Grand Jury which returned an indictment on the

15 same counts in the information.  In other words, the

16 information and the indictment are identical.

17         Is that correct, Mr. Jennen?

18         MR. JENNEN:  Yes, Your Honor.

19         THE COURT:  Good.  Now, on August the 5th of

20 2020, Mr. Garfield appeared with Mr. Pierce before this

21 Court.  At that time, he waived the right to be charged by

22 an indictment and consented to the filing of an information

23 charging him with one count of possession of a machine gun,

24 one count of possession of an unregistered silencer, and

25 one count of possession by a prohibited person.  The

information also included a forfeiture allegation.
Mr. Garfield pled guilty to the information pursuant to the
terms of a written plea agreement.

Now, Mr. Garfield, I need to just ask you a
couple of questions.  The first one I'm going to ask you,
have you been satisfied with the counsel, the
representation, and the advice that you have received from
your attorney, Mr. Pierce?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  A presentence investigation
report was prepared in this matter on September the 23rd of
2020, and a final report was filed on October 13 of 2020.

Mr. Garfield, did you have an opportunity to
review and to read this presentence investigation report
and discuss it with your lawyer, Mr. Pierce?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Good.  And Mr. Pierce and Mr. Jennen,
have you both reviewed the presentence investigation report
including any revisions that may have been made to that
report after the initial disclosure?

MR. PIERCE:  Yes, Your Honor.

MR. JENNEN:  Yes, Your Honor.

THE COURT:  Good.  And the defendant had no
objections and the government had no objections to the
original presentence investigation report, so the Court

1  will adopt the final presentence investigation report as

2  filed.

3          Now, at this time, I'm going to set forth what

4  the sentencing options are in the case.  These are the

5  statutory penalties that apply to the counts in the

6  information.

7          There are three separate counts, as I mentioned.

8  The statutory penalties applicable on Count One are the

9  maximum term of imprisonment of 10 years, a term of

10  supervised release of not more than three years, a maximum

11  fine of $250,000 and a mandatory special assessment of

12  $100.

13          Now, the statutory maximum penalties on Count Two

14  of the information include a term of imprisonment, maximum

15  term of imprisonment of 10 years, a term of supervised

16  release of not more than three years, a maximum fine of

17  $10,000, and a special assessment of $100.

18          For Count Three of the information, the maximum

19  term of imprisonment is 10 years, a term of supervised

20  release of not more than three years, a maximum fine of

21  $250,000, and a mandatory special assessment of $100.

22          Essentially, the statutory maximums are the same

23  for Counts 1 and 3 and for Count -- excuse me -- 1 and 3,

24  and then Count 2 is differently.  Mainly the maximum fine

25  is the difference between those regarding the statutory

1  penalties.

2           Now, the United States Sentencing Guidelines are

3  advisory.  I've consulted those guidelines in determining

4  the sentence to impose, but recognize that I have the

5  authority to depart or vary from that recommendation in the

6  sentencing guidelines.

7           At this time, I'm going to do a guideline

8  calculation.  I'm going to follow the presentence report

9  and go through my own guideline calculation.  Under

10 3D1.2(d), Counts 1, 2 and 3 are grouped for guideline

11 purposes.  In other words, they are considered together.

12 Under 2K2.1, the base offense level is a level 20.  Because

13 the defendant possessed 13 firearms, the offense level is

14 increased by four levels.

15          Now, the probation office in the presentence

16 investigation report awarded the defendant a two-level

17 reduction for acceptance of responsibility.  I've read the

18 presentence investigation report and I've concluded, after

19 reading it, that this defendant has not accepted

20 responsibility for his criminal conduct, so I'm not going

21 to give the defendant a two-level reduction for acceptance

22 of responsibility, nor does the government need to move for

23 an additional downward -- for an additional motion for

24 additional points since I'm not going to award the

25 two-level reduction for acceptance of responsibility.

1          I base that not only on the offense conduct, but

2    also looking at paragraph 98 of the presentence

3    investigation report.  The defendant entered a plea of

4    guilty in the case on advice of counsel.  Defendant

5    acknowledged the conduct, expressed agreement with the

6    factual basis presented to the Court at the time of the

7    change of plea.

8          And basically I disagree with the probation

9    officer.  She said just the fact that he pled guilty, that

10   was sufficient for him to accept responsibility.  I don't

11   see anything, particularly in this offense conduct, or any

12   other statement that would entitle him to a two-level

13   reduction for acceptance of responsibility.  Therefore,

14   it's the Court's view that the offense level is a level 24.

15         Criminal history category, he has one criminal

16   history point, which places him in Category I, so the

17   guidelines recommend the following sentence:

18         A term of imprisonment of 51 to 63 months, a term

19   of supervised release of one to three years, a fine in the

20   range of 20,000 to 200,000, and then a mandatory special

21   assessment of $300.  That's $100 on each count.

22         So now in calculating and determining the

23   sentence that the Court is to impose, the Court is going to

24   base it on the factors found in Title 18 United States Code

25   Section 3553(a).  That is, the nature and the circumstances

1   of the offense.  The defendant's history and
2   characteristics.  The sentencing range under the guidelines
3   of 51 to 63 months.  And the need to avoid unwarranted
4   sentence disparities among defendants who have similar
5   records and have been found guilty of similar conduct.
6           Now, the Court is considering an upward variance
7   in the case based on the offense conduct.  And so at this
8   time, I'll ask Mr. Jennen if he has any comments regarding
9   what sentence the Court should impose.
10          MR. JENNEN:  Thank you, Your Honor.
11          Your Honor, as outlined in the government's
12  sentencing memorandum, the government has asked this Court
13  to apply a seven-level upward departure.  And as the Court
14  knows, the basis for that is two-fold.  First, the
15  government believes there are aggravating circumstances of
16  a kind and to a degree not adequately taken into
17  consideration by the sentencing guidelines.
18          And two, the government believes the offense
19  conduct was calculated to influence or affect the conduct
20  of the government by intimidation or coercion, or to
21  retaliate against government conduct.
22          As is very clear from the offense conduct section
23  of the PSR, there is substantial aggravating factors not
24  accounted for in the sentencing guidelines.  First, the
25  firearms he has been convicted of possessing were obtained

1  for his repeated stated purpose of committing acts of

2  violence against religious, racial and ethnic minorities,

3  and as well as to carry out mass casualty attacks.  I'm not

4  going to reiterate the facts in support of the government's

5  argument here, Your Honor, as I think they are sufficiently

6  outlined and I know the government has reviewed the

7  sentencing memorandum.

8            THE COURT:  The probation officer, this

9  particular probation officer always does a very good job.

10           MR. JENNEN:  Yes, Your Honor.

11           THE COURT:  And she has done the best job of

12  laying out the offense conduct, some of the best I've seen.

13  And it's laid out extensively very well.  And the Court

14  understands it and has read it many times.

15           MR. JENNEN:  Yes, Your Honor.  And the facts in

16  the presentence report the government relied upon are

17  summarized in pages 3 through 4 of its sentencing

18  memorandum.

19           Number two, Your Honor, the facts in the PSR also

20  show that the defendant sought to influence a high school

21  student to ascribe to his ideals of white supremacy, as

22  well as to participate in acts of violence and terrorism

23  against racial, ethnic, and religious minorities.

24           Three, the defendant made clear his wish to

25  recruit other individuals to join him in a perceived

1  imminent race war with a preference for young adults aged

2  18 to 20 years old.

3          Your Honor, these aggravating factors highlighted

4  by the government now and in its sentencing memorandum as

5  well as contained in the presentence investigation report

6  are not accounted for in the guidelines, and pursuant to

7  5K2.0 warrant, we believe, a seven-level upward departure.

8          THE COURT:  Let me -- I don't have the sentencing

9  memorandum in your book here.  Could you tell me what -- we

10 don't have a sentencing memorandum on the docket.

11         Did you file a sentencing memorandum?

12         MR. JENNEN:  Yes, Your Honor.

13         MR. PIERCE:  Your Honor, it's filed under seal.

14         (pause)

15         THE COURT:  Okay.  Thank you, Mr. Jennen.

16         MR. JENNEN:  Yes, Your Honor.

17         Your Honor, the government also contends in

18 addition to Subsection 5K2.0 that the seven-level upward

19 departure is also warranted based upon application note 4

20 to Section 3A1.4, the terrorism enhancements guideline.

21 The note, application note 4 to that guideline states that,

22 "An upward departure is warranted when the offense of

23 conviction is not a federal crime of terrorism" -- which

24 the defendant has not been convicted of -- "but the conduct

25 was calculated to influence or affect the conduct of

government by intimidation or coercion or to retaliate against government conduct."

As the Court is well aware from the offense conduct in the PSR, the defendant repeatedly stated that his purpose for obtaining and stockpiling weapons and manufacturing machine guns was in preparation for what he believed to be an imminent race war.  He discussed overtaking an Air Force base.  The defendant expressed his desires to replicate the Oklahoma City bombing carried out by Timothy McVeigh of the Alfred P. Murrah Federal Building.  The defendant discussed carrying out attacks on ATF headquarters in Washington, D.C.  The defendant talked about his willingness to assassinate the Governor of Virginia for prohibiting firearms on public grounds.  The defendant also discussed his interest in carrying out an attack of a black Arkansas State Senator.

His fiance, as related in the presentence investigation report, Ms. Kaytlyn Tippett, explained to law enforcement that the defendant idolized Adolf Hitler and Brenton Tarrant, the Christchurch New Zealand mosque shooter, because -- and the quote is, to quote her -- "The United States government was not doing anything about people coming in and trying to take over the country."

The government argues that the facts contained in the presentence investigation report show that the

1    defendant's offense conduct was calculated to influence or
2    affect the conduct of government by intimidation or
3    coercion or to retaliate against the government conduct.
4    And for that reason, the Court should apply the requested
5    seven-level upward departure.

6          All that said, the Court should apply a
7    seven-level upward departure with the resulting guideline
8    range of, it was 78 to 97 months, but with the additional
9    three levels because the Court did not award acceptance of
10   responsibility, the resulting guideline range, Your Honor,
11   would be 108 to 135 months.

12         The defendant argues in his sentencing memorandum
13   that the Court should not apply an upward departure of any
14   kind because the defendant is, quote, "young, has very
15   little criminal history, and has never been incarcerated
16   before."  The government agrees that those things are
17   mitigating facts.  However, the aggravating factors in the
18   government's opinion greatly outweigh the mitigating
19   evidence present in this case.

20         The government would also point out that in
21   preparation for this sentencing hearing, the defendant
22   discussed his history and offense conduct with Dr. Sam
23   Wallace, which is found in the exhibit to the sentencing
24   memorandum at Document 43-2.  During that, the defendant
25   stated that he became radicalized on "4 Chan" and, quote,

1   "The information he obtained confirmed his personal

2   beliefs."  That's at page 9.

3           The defendant stated that he only cares about

4   his, quote, "own people."  Again at page 9.  Dr. Wallace

5   related that the defendant, quote, "Described his anger at

6   a small group of people exerting power over others and

7   noted that Jews own the news media and the banks."  Again

8   at page 9.  The defendant told Dr. Wallace that he did not

9   like black people and said that, quote, "They act like

10  retards."  And they are, quote, "All the same," adding, as

11  the Doctor described with a frustrated tone, "Have you ever

12  been around them?"

13          Even after being convicted of firearms offenses,

14  the defendant maintains that he should be able to possess

15  weapons because, quote, "The world is going to expletive,

16  and that he shouldn't just lay there and take it."  That's

17  at page 9 as well, Your Honor.  The defendant said there

18  was, quote, "Nothing wrong with his idolization of Brenton

19  Tarrant," the Christchurch New Zealand mosque shooter.

20  That's at Page 10.  The defendant defended his belief in

21  accelerationism and stated that he was not willing to,

22  quote, "Sit there and expletive take it."  That's at

23  page 10 as well.

24          Your Honor, the government would note that all of

25  these statements were made after he had pled guilty and

1    knowing that this Court would soon be pronouncing sentence

2    and that the purpose of that interview was for sentencing

3    evidence.

4           Most disturbing to the government is

5    Dr. Wallace's statement that, "Contrary to the defendant's

6    claims that his repeated statements regarding his desire to

7    commit violent acts against minorities were" -- in his

8    words -- "dark humor," that Mr. Wallace determined, quote,

9    "He cannot ascertain the validity of his report that his

10   commentary regarding violence against various groups of

11   people were fiction and for entertainment versus genuine

12   threat."  That's scary, Your Honor.

13          Based upon all that and based upon all the

14   evidence before the Court at this time, and in light of the

15   3553(a) factors, the government would argue that the Court

16   should apply a seven-level upward departure and sentence

17   the defendant to a guideline sentence in the resulting

18   guideline range.  Thank you.

19          THE COURT:  Thank you, Mr. Jennen.  Mr. Pierce?

20          MR. PIERCE:  Thank you, Your Honor.

21          Your Honor, in preparing for today, I've been

22   thinking a lot about working with Mr. Garfield.  He has

23   been in custody since March of last year, over 14 months.

24   And I have come to know Mr. Garfield in a way that's a

25   little unusual simply because of the amount of time that we

1  spent, but also because he's very young.  And I've seen him

2  change, and I've seen his attitude change during the period

3  of time that I've been working with him.  And I think that

4  the Court should seriously listen to what he has to say

5  when I'm done today.  I know in advance --

6          THE COURT:  Of course, what you're telling me now

7  is based on interviews you have had with him.  There is

8  nothing in the record that expresses -- I'll give him the

9  right to allocute here in a moment after you have your

10  time.  But, I mean, this is some of the most reprehensible,

11  horrific conduct I've seen since I've been on the bench.

12  And then when he says he was just -- anybody who believes

13  that just -- is just -- I was just joking.  It's just

14  astounding that that would be the response that he would

15  have in an interview about this.  I can't really -- I mean,

16  I'm going to refer to that part of the PSR because I meant

17  to mention that a minute ago when I denied his acceptance

18  of responsibility.

19          "Only a fool would take them as serious."  Only a

20  fool.  He may think I'm a fool here.  I don't care what he

21  thinks of me.  But I'm reading this.  This is the some of

22  the most horrific, reprehensible conduct I've seen.  He's

23  lucky that the statutory maximum is 10 years.  It's the

24  Court's view that the statutory maximum penalties on some

25  of these offenses, firearms offenses is just too low.  But

1    Congress gets to decide that, not me.  So go ahead.

2           MR. PIERCE:  Thank you, Your Honor.

3           Your Honor, as I was saying, I've gotten to know

4    Mr. Garfield, and I have seen a change in him during the 14

5    months that I've gotten to know him.  And I want the Court

6    to think about that.  I understand the conduct is very

7    reprehensible.  It is what it is.  It's black and white.

8    We can see it.  We have gone over it.  It's one of the

9    longest presentence reports I've ever seen for a gentleman

10   in a criminal history Category I.

11          What I found incredible here is the idea that

12   this young man, who was 21 years old when this activity

13   started, is still young and his mind is not fully formed or

14   developed.  We know that, Your Honor.  It's almost -- I

15   think the Court can even take judicial notice of the

16   insurance industry says that young males have a high

17   insurance risk until they're 25 years old.  There's a

18   reason for that, because their minds are not fully formed.

19   We see that all the time in drug cases.

20          THE COURT:  You know, I don't take that as an

21   excuse.  This United States Capitol was full of

22   20-year-olds, and they are breaking down, violating the

23   law.  Someone who is that age ought to know the difference

24   between right and wrong, ought to know what's a violation

25   of the law and what's not a violation of the law.

1          The real mitigating factor for him, he had -- the
2   offense conduct is horrific.  He had a pretty horrific
3   background growing up.
4          MR. PIERCE:  Yes, Your Honor.
5          THE COURT:  And that may have formed some of his
6   views on life.  It's awful.  It's unfortunate some children
7   who grow up in that type of atmosphere don't have a chance,
8   and it's not because of their own making.  But they reach
9   an age at some point in time they have to make a choice in
10  life of what they are going to do.
11         MR. PIERCE:  And I understand that, Your Honor.
12         Let me move to, shift to that.  When he described
13  his growing up and his childhood as horrific is an
14  understatement.  And I have heard with many defendants,
15  many of my clients describe their childhoods.  I've never
16  heard of anyone like this one before.  That is horrific.
17  And what do we expect will happen to someone who is brought
18  up in those consequences?  What do we expect their
19  attitudes and their perceptions to become when, at six
20  years old, he's shown pornography.  Before he's eight years
21  old, he's already been sexually violated by a man who they
22  tell him that's his father, and it's not.
23         His stepfather was a black man.  His stepfather's
24  name is on his birth certificate, is my understanding.  The
25  biological father was gone.  And mama was using any ability

1  for any stability that she could have, even with the
2  gentleman who turned out to be her pimp.  There were drugs
3  in the home.  She was a prostitute.  That's all in the
4  report, Your Honor.  And that's starting at four years old,
5  five years old, six, eight.
6          Then at some point, the stepfather is out of the
7  picture, and another gentleman, Mr. Carr comes in.  And
8  this is all covered in the sentencing memorandum and
9  Dr. Wallace's report, as well as the presentence report.
10  And he thought, well, maybe Mr. Carr will be better to me.
11  They played video games and got along.  But over time,
12  Mr. Carr physically assaulted him.  Mr. Carr sexually
13  assaulted him.
14          You know, Your Honor, the government is real
15  concerned about influenced young people.  Where was their
16  concern when he was six years old?  When he was eight years
17  old?  When he was 10 years old?  When he was 14, 16, 18,
18  where was the government then?  Mama finally gets to the
19  point she can no longer contain Mr. Garfield, so she has a
20  protective order issued against him.  And that's all
21  covered in the report.  And he finally gets old enough and
22  big enough where he's like, I've had it.  And he's living
23  on the streets.  He's living with friends, even with
24  teachers or anyone who will put him up for a while.  Yet he
25  still graduated high school.

 1           Do we really think, are we naive enough to think,
 2    that growing up in that kind of situation is going to lead
 3    to a normal thinking or judgmental process?  It's not.  I
 4    consider myself so lucky.  I had two loving parents.  I
 5    grew up with them.  They gave me some degree of
 6    individualization.  And I'm so thankful I had that.  That's
 7    something he'll never have.  He'll never even be given the
 8    chance to go back to something like that.  And yet we
 9    scratch our heads and think, how did he end up being so
10    radicalized?
11           I think Dr. Wallace really hits the nail with the
12    hammer when he says, he needs counseling, he needs
13    treatment, he may need pharmacological intervention.  But
14    the one thing Dr. Wallace told me when I reviewed the
15    report with him in anticipation of a hearing today, he
16    said, the one thing I can tell you, Mr. Pierce, is
17    Mr. Garfield is still capable of meaningful change.  Still
18    capable of meaningful change.  What makes that statement so
19    critical here is that Mr. Garfield really has nowhere else
20    to go.  He's pretty much hit rock bottom.  He's lost his
21    family.  He's lost his rights.  He's losing his liberty.
22    What else can we do for him?  Do we just punish him for his
23    ideas?  Yes, those were ideas.  They were bad ideas.  But
24    you know what?  So was the other people involved in those
25    conversations.

1          Mr. Garfield was 21 when he got involved with

2    some of these conversations.  That's when it was

3    discovered, but it goes back before then.  Whatever

4    happened to James Wisdom?  Nothing.  Why not?  He had

5    violent rhetoric.  He was goading back and forth.  Nothing

6    ever happened with him.  What about Mr. Pelts?  Now,

7    Mr. Pelts was sentenced before this Court for buying him a

8    firearm back in February.  But wasn't Mr. Pelts the one who

9    created the "Right Wing Death Squad" chat page on Facebook?

10   Wasn't it him?  That's what it says.  That's what he told

11   people.  And yet Mr. Pelts, he gets 24 months of probation.

12         Now, I understand that's a different crime.  I

13   understand that.  But the rhetoric is still the same.  Why

14   are we going to punish him --

15         THE COURT:  I tell you on Pelts, I went through

16   and analyzed all those Facebook messages about who was

17   making the statements and who was responding and so forth.

18   I gave careful consideration to that, as much as I have to

19   this case too.

20         MR. PIERCE:  And I appreciate that, Your Honor.

21         But there are other individuals who have never

22   been charged with anything.  And I'm not saying they should

23   or shouldn't be.  That's the government's job.  They get to

24   pick and choose who they want to go after and who they want

25   to leave alone.  I understand that.  But he's a target.

1   He's a huge target with a target on his back.  It just

2   seems -- it just seems incredible to me that as

3   reprehensible as the behavior is, that society has gotten

4   to the point that we are just going to warehouse him away

5   and just take away his freedoms for protection of the

6   public for something that came across as an idea, not as a

7   deed.

8          Now, the deeds?  Okay, he had -- he made machine

9   guns.  The deeds, he had a silencer.  The deeds, he had

10  guns he shouldn't have had.  He understands all those

11  things.  He understands he's got to be punished for all

12  those things.  But at what point do we draw the line and

13  say, this punishment is sufficient, but not greater than

14  necessary.  And that's where I'm having a hard problem

15  here, Judge.  I understand -- you know, Judge, I don't envy

16  you, because this is going to be a hard case, to me.  Maybe

17  it's not.  Maybe I'm being naive.

18         THE COURT:  No, it's a very difficult one.  In

19  fact, these are some of the cases I could easily have done

20  by videoconferencing, but after reading the PSR in this

21  case, I decided that this needed to be an in-court

22  sentencing hearing.

23         MR. PIERCE:  And I appreciate that, Your Honor.

24  I think that body language helps us understand a lot, not

25  just the words.  I mean, you can't see much when you only

1  see this much.  You can't get much out of the
2  communication.
3          Your Honor, I could go on, but let me just
4  summarize it this way.  Mr. Garfield is now, he's now 23.
5  That's all.  He's just 23 years old.  This conduct happened
6  when he was 19, 20, 21.  But since 21, he's been in
7  custody.  His 22nd birthday was in custody over this
8  behavior.  And I submit to the Court that his description
9  to Dr. Wallace was really more of a historical note, not so
10  much as, "This is how I still feel."  I'll let him tell you
11  what he feels.  But when Dr. Wallace -- and I find it
12  incredible that the government is going to use the
13  statements that my client gives to his doctor to try to get
14  treatment, to try to understand why does he think the way
15  he thinks, against him as an enhancement for sentence.
16  That's going to chill anyone who wants treatment.  They are
17  just going to say, "I'm just going to say nothing."
18          I submit that that's more historical data than
19  how he currently feels.  I'll let him tell you for himself
20  what he feels.  I mean, I'm not going to jump in his shoes.
21  I want him to explain that for you, Your Honor.  But I
22  think any upward variance is unneeded.  I think I have that
23  the range -- I originally thought --
24          THE COURT:  Frankly, I'm appalled at the
25  sentencing range for what the offense conduct is.  I mean,

1  I knew when I read this, I knew I was going to do an upward
2  variance.  I mean, the offense conduct is not -- you just
3  cannot explain it away.  I mean, here is somebody who knew
4  he could not possess a firearm, and other individuals
5  acquired firearms for him.  Not only did he just acquire
6  firearms, he made them fully automatic, made them machine
7  guns, had a silencer.
8          MR. PIERCE:  Yes, Your Honor.
9          THE COURT:  I mean, these firearms offenses are
10  some of the worst I've seen.  I mean, you take somebody who
11  is convicted of a felony that goes out there and has a
12  9 millimeter just because they are going to use it to
13  protect their drug trade is far different from someone who
14  has these ideas about race wars and so forth and converts
15  AR-15s into fully automatic weapons and talks about
16  training out in the field, and talks about doing a
17  "McVeigh" at the courthouse in Little Rock.
18          I don't know what drove this young man into this
19  thinking.  There's no question that his background set him
20  up for this.  But I tell you another view I had.  He's
21  probably a fully intelligent individual.
22          MR. PIERCE:  I believe that, Judge.
23          THE COURT:  I don't think this guy is dumb at
24  all.  I think he's probably highly intelligent, and he knew
25  what he was doing.

1          MR. PIERCE:  Your Honor, I agree with --

2          THE COURT:  This is one of these more difficult

3  cases where the -- I've got some of them tomorrow too.

4  They're just difficult when the Court has responsibility of

5  figuring out under 3553(a) where to lay the sentence.  It's

6  not easy to do.

7          MR. PIERCE:  Well, Your Honor, although I may

8  disagree with the Court by denying Mr. Garfield acceptance

9  of responsibility, I would submit that that is enough of an

10  upward departure for Mr. Garfield, because his range is now

11  51 to 63 months.  That's over four years to over five

12  years, for a person who has never had a felony before.

13  He's had a misdemeanor, but he's never had a felony before.

14          His prohibited person conduct was the mental

15  illness that he had with the altercation with this mother

16  who we discussed ad nauseum.  So, Your Honor, I submit to

17  the Court that an upward variance of seven levels is just

18  overly punitive.  It's not needed.  And where he needs to

19  be is in a diagnostic or a medical unit that can address

20  his needs.  Again, Dr. Wallace said he is still capable of

21  meaningful change.  He's still 23.

22          When he's released, Judge -- because he will be

23  released at some point -- he's going to be on supervision.

24  There are going to be rules for that.  We can monitor his

25  progress once he's released.  And if there's any problems

1  at all --

2          THE COURT:  That's really one thing that astounds

3  me about the statute is the statutory maximum supervised

4  release is three years.  I put people on supervised release

5  for five and 10 years all the time because it's necessary

6  to protect the public from further crimes.  This is just

7  three years.

8          MR. PIERCE:  But that's still three years, Your

9  Honor.  Your Honor, even at the low end, he's going to be

10  in his 30s before he's released off of everything.  Before

11  he makes his term of incarceration, before he meets his --

12  finishes his term of supervision, he's going to be in his

13  30s.  What kind of person are we going to make him into

14  from here?  That's all that I have, Your Honor.

15          THE COURT:  Okay.  Thank you, Mr. Pierce.  You

16  did a good job.  Your job is to be an advocate and you do

17  it well.

18          MR. PIERCE:  Well, thank you.

19          THE COURT:  Now, Mr. Garfield, you can remain

20  seated there, but I'm going to give you an opportunity to

21  speak.  You've heard a lot going on here today.  I want you

22  to take the time to say whatever you wish to say in your

23  allocution.

24          THE DEFENDANT:  Thank you, Your Honor.

25          Your Honor, I'd like to start by simply

1   acknowledging that I was in the wrong.  I know there's been

2   some back and forth over whether I really accepted

3   responsibility over it.  But I'd like to say that group

4   think is a real thing, and that being away from the groups

5   I was a part of for the last 14, going on 15 months, it

6   has -- that time to reflect, I can really see where it's --

7   it was definitely bad, as you said, heinous.  Sorry.  I'm

8   going to just write --

9           THE COURT:  That's okay.  I want you to --

10  Mr. Garfield, I want you to take your time.  I know you've

11  written some things up.  But just relax, because I want to

12  hear from you.  Also, that microphone, don't get too close

13  to it, but anyway, I want to make sure I can understand

14  you.

15          THE DEFENDANT:  All right.  I know that as it

16  stands right now, my mark on the world was -- well, for

17  lack of a better word, it's bad.  What I said and thought

18  was downright disgusting at times.  You've seen the

19  conversations between several people in my group chats.

20  And I've disappointed everyone so far.  Lost, as it stands,

21  I've lost almost everything, some of my closest friends

22  from third and fourth grade and up.  Lost a job and all my

23  transportation.  Lost my congregation at church.  The type

24  of people that I'm not going to get back.

25          I didn't really -- I had just found my family

1  about a little over a year before my arrest.  Well, a year

2  and a half.  We are products of our environments.  A lot of

3  the beliefs that I've had, issues I still have, I mean,

4  lived in a hostile environment in a constant state of

5  paranoia, 23 years.  So some of those memories are --

6          Now, after all this, whatever the Court decides

7  to do with me, when I come out of it, I'm going to have a

8  criminal record.  That is not going to go away.  I don't

9  see myself getting a pardon for that, ever.  It's going to

10  make my life harder finding employment.  I know it's easier

11  these days than it was 20 years ago for a felon, but I

12  think the nature of my case is going to cause a hindrance.

13          I'm scared of becoming like my biological father

14  that as you know spent several years in federal prisons.

15  Never met the man.  Talked to him on the phone a few times.

16  And I don't know what happened with him.

17          My second stepfather and most of his friends

18  spent years in prison, and I've seen firsthand what doing

19  long periods of time incarcerated did to them.  They

20  couldn't hold down jobs, couldn't really function.  Second

21  stepfather ended up sexually assaulting me.  And part of it

22  was, in one conversation we had, it was over -- it led me

23  to believe that being in prison caused him to do that.  But

24  it wasn't his first time.

25          I'm locked in my cell for 23 hours a day, have an

1   hour out to take a shower, call my family when I can.  So

2   most of my day is spent thinking.  Thinking that if I had

3   made -- if I had made an effort to get away from

4   everything, to try and better myself, to take

5   responsibility, be a better person for my family and

6   myself, that this could be a totally different situation

7   right now.  I could have been married already, hold my

8   first child, not having to worry about what they are going

9   to go through as they grow up.  Knowing that I can steer

10  them away from the direction that I've been in.  That --

11  sorry.

12          All I've ever wanted in life is a family that

13  will love me for who I am.  And I've let them down,

14  disappointed them greatly.  I have to try and come back

15  from that.  And I'm worried if I will be able to after all

16  this is said and done.  If I will be able to be a

17  productive member of society and take care of myself and do

18  what's right.  And hopefully be able to help people that

19  are in my shoes, help steer them in the right direction,

20  keep them from making these choices, because it's -- there

21  is a point of no return on it, as we see throughout

22  history.  And I am sort of thankful that I am here now,

23  that things couldn't escalate and I reach that point of no

24  return, that I am able to step back and see it and have a

25  better understanding.

1          Your Honor, I just hope I have the opportunity to

2   do what's right, make things right before it's too late.

3   That's all, Your Honor.

4          THE COURT:  Okay.  I just want to make one

5   comment, then I need to ask Mr. Jennen a question.

6          You just confirmed to me that you're a bright,

7   intelligent individual.  I don't know if you wrote that

8   yourself or your lawyer helped you or whatever, but it's

9   very well written.  You expressed yourself very well.  In

10  fact, you've expressed yourself much better than most

11  defendants that come here to the courtroom.  Most of them

12  come in here and say, "I'm sorry for taking the Court's

13  time," or some answer like that.  But you're a bright

14  individual.  And I'm going to impose sentence here

15  momentarily, and I don't know if you are going to be able

16  to rehabilitate yourself or not.  Prison is not the easiest

17  place to be rehabilitated.  But, I mean, courts have to

18  impose sentence that shows respect for the law, that shows

19  just punishment for the offense that occurred, so I'm going

20  to go through those in a moment.  But anyway, I appreciate

21  your comments.

22          What I need to clear up, Mr. Jennen, did you move

23  for upward departure, or are you just moving for upward

24  variance?

25          MR. JENNEN:  An upward departure, Your Honor.

1          THE COURT:  So there's a motion pending and I

2     need to rule on that motion?

3          MR. JENNEN:  Yes, Your Honor.

4          THE COURT:  That's clear.  My law clerk picked

5     that out for me.  So often, the way the guidelines work and

6     the way sentencing works under the 3553(a) factors, we so

7     often deal with these issues with variances as opposed to

8     departures.  But a departure is, under the guidelines, an

9     option for either party to move for a departure based on

10    the guideline calculation.

11         But in any event, I need to rule on that motion

12    for the record.  I'm going to deny the motion for an upward

13    departure.  And as I mentioned, I am considering an upward

14    variance based on the 3553(a) factors.

15         So having ruled on that motion, again, the

16    guideline range that I calculated is 51 to 63 months.  And

17    the guideline range is one of the factors that the Court

18    takes into account in imposing the sentence.

19         Let me discuss the 3553(a) factors.  And I'm not

20    going to discuss them in much greater detail because I've

21    already actually mentioned them quite a bit during the

22    discourse here between the counsel and the Court regarding

23    the sentence the Court would impose.  But anyway, let me

24    just kind of briefly go back and discuss those again.

25         He's got three firearms convictions.  And he's an

1  individual who normally could not possess these firearms
2  based on a court order entered by Johnson County Circuit
3  Court.  And even knowing he could not do that, he possessed
4  an arsenal of firearms that included fully automatic
5  weapons, silencers, and other firearms, along with
6  ammunition.  And while it was illegal for him to possess
7  those, when you look at the firearms that he possessed and
8  you read the rhetoric that was captured from the seizure of
9  the Facebook records of the text messages and other
10  conversations, and also the information that was obtained
11  through the Title III wiretap, he had the ability to cause
12  some horrific crimes.  He really did.  And that's what
13  makes this case so serious, because even though it was just
14  a conviction for possession of firearms, when you take that
15  with the rhetoric that he engaged in, it was the recipe for
16  some serious, serious, horrific offenses.
17         Again, in 2019, that's when the FBI opened up
18  this investigation and obtained these Facebook chat
19  messages that had a lot of this information.  One thing I
20  notice in going back through there, I don't know what the
21  period of time was for the subpoena of records, but when he
22  was interviewed, he said anybody -- a fool would think -- I
23  can't remember exactly how he said that.  I was just kind
24  of astounded by that comment he made, "who does not think
25  I'm joking is just a real fool."

 1          But nevertheless, these comments went on for a
 2   long period of time.  These weren't offhand comments that
 3   were just made.  They went on for a long period of time,
 4   and that's of great concern to the Court as well.  Also,
 5   there was the discussion about setting off bombs like the
 6   Oklahoma City bombing.  Through his employment, he had
 7   access to anhydrous ammonia, which could have been used to
 8   manufacture a bomb.  In fact, he discussed in some of these
 9   chats about how to make bombs.
10          But in any event, the offense conduct in this
11   presentence report is laid out so well and gives the Court
12   so much information, I could discuss the nature and
13   circumstances for the rest of the day, which I'm not going
14   to do.  But anyway, I do think that the nature and
15   circumstances of the offense dictate an upward variance.
16          The defendant's history and characteristics.
17   While the probation office does do a good job, of course
18   the information they put in the presentence report is based
19   on what he tells them.  I think that his description, his
20   allocution here about his background and how he grew up
21   shows what a horrific background he had.  And I think -- I
22   don't know that there's any question that the problems he
23   has today are a result of this background.  He wasn't just
24   exposed intermittently to some problems.  Apparently, this
25   was a difficult childhood throughout his entire childhood.

1  And the Court just hates to see this happen.  And it

2  happens in a lot of cases and a lot of these defendants who

3  come to court have difficult childhoods.  I think he's

4  probably had one of the more difficult childhoods I've seen

5  of any of the defendants that have been here.

6          I'd also say that the report that was prepared by

7  Pinnacle, I'm hopeful that Dr. Wallace's diagnosis and

8  comments regarding this particular defendant are accurate,

9  because if they are accurate, he does have some opportunity

10 or chance at rehabilitation.  And also the Court believes

11 that Mr. Garfield is a very intelligent individual, so I

12 think he possesses the ability to be able to do something

13 about his return to society.

14          Again, the Court needs to impose a sentence that

15 shows seriousness of the offense and provides just

16 punishment, the need to protect the public from further

17 crimes.  All those are taken into account in determining

18 the sentence.  The need to avoid unwarranted sentence

19 disparities.  The government made reference to the

20 terrorist guidelines and so forth.  We're fortunate this

21 case never crossed that bright-line, but I think those to

22 some extent -- I'm not going to say necessarily overstate,

23 but doesn't accurately describe I think what the offense

24 conduct is here.  I think that the presentence report does

25 a very good job of that.

 1            So here's what I am going to do.  I gave this
 2    case a lot of thought before the sentencing hearing about
 3    where this sentence would land.  And after hearing
 4    everybody, hearing the government, hearing the defendant,
 5    it's going to land right where I thought it would land
 6    before I entered the courtroom.  But I wanted to hear from
 7    everyone before, make sure that it kind of confirms.  But
 8    here's what I'm going to do.
 9            I'm going to do upward variance.  I'm going to
10    impose a term of imprisonment of 78 months.  I think that
11    is sufficient, but not greater than necessary, to comply
12    with the goals of sentencing.  That will be 78 months on
13    Count One, Count Two, and Count Three.  And they will run
14    concurrently.
15            The Court will impose a term of three years on
16    each count, three years of supervised release on each
17    count.  They are to run concurrently.  And that term of
18    supervised release will contain two special conditions.
19            Number one, the defendant shall submit to
20    inpatient or outpatient mental health testing, evaluation,
21    counseling and/or treatment as deemed necessary and
22    directed by the United States Probation Office.
23            Number two, the defendant shall submit to a
24    search of his person, real and/or personal property,
25    residence, place of business or employment and/or vehicles

1   conducted by the United States Probation Office based upon

2   a reasonable suspicion of criminal activity or any

3   violation of a condition of supervised release.

4           The Court finds the defendant does not have the

5   ability to pay a fine, therefore, no fine will be imposed.

6   The Court will impose a special assessment of $300, which

7   is mandatory and due immediately.

8           I also have here a final order of forfeiture that

9   forfeits the firearms.  I've signed the final order of

10  forfeiture, which will be entered.

11          Mr. Pierce, do you know of any legal reason why

12  the sentence should not be imposed as stated?

13          MR. PIERCE:  No, Your Honor.

14          THE COURT:  Do you, Mr. Jennen?

15          MR. JENNEN:  No, Your Honor.  Just one thing

16  regarding the final order of forfeiture.

17          After the preliminary order was entered, the

18  government realized that one of the firearms in the

19  preliminary order -- that would be the Brownell -- there is

20  a statement on this in the final order.  That was actually

21  the property of the government, and therefore, we are

22  dismissing the forfeiture as to that firearm.

23          THE COURT:  Okay.  I didn't fully understand you.

24  What now?

25          MR. JENNEN:  The Brownell Model BRN-4 5.56

1   caliber M-16 firearm, the Court had entered a preliminary

2   order of forfeiture as to that firearm.  However, after

3   entry of the preliminary order, the government realized

4   that that firearm actually was the property of the

5   government.  It had been used in an undercover operation

6   and was not the property of the defendant, therefore --

7          THE COURT:  Has it been deleted from this final

8   order?

9          MR. JENNEN:  Yes.

10          THE COURT:  Okay.  That's fine.

11          MR. JENNEN:  There is a statement in the final

12   order dismissing the forfeiture as to that firearm.  But

13   nothing further, Your Honor.

14          THE COURT:  Good.  Then the sentence is imposed

15   as stated.

16          Mr. Garfield, you have a right to appeal your

17   conviction if you believe that your guilty plea was somehow

18   involuntary or there was some other fundamental defect not

19   waived by your guilty plea.  You also have a statutory

20   right to appeal the sentence under certain circumstances,

21   particularly if you think it's contrary to law.

22          Any notice of appeal must be filed within 14 days

23   of the entry of the judgment.  If requested, the clerk will

24   prepare and file a notice of appeal on your behalf.  If you

25   cannot afford to pay the cost of appeal, you have the right

1  to apply to appeal *in forma pauperis*, which means you can

2  ask the Court to waive the filing fee, and under appeal,

3  you can apply for court-appointed counsel.

4          Mr. Jennen, now that the Court has imposed

5  sentence, are you going to move for dismissal of the

6  indictment?

7          MR. JENNEN:  We so move, Your Honor.

8          THE COURT:  The indictment will be dismissed.

9          Anything further from the government?

10         MR. JENNEN:  No, Your Honor.

11         THE COURT:  Anything further from the defendant?

12         MR. PIERCE:  No, Your Honor.

13         THE COURT:  The defendant will be remanded to the

14  custody of the United States Marshals and the Court will be

15  in recess.

16          (proceedings concluded)

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

      I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

      Dated this 11th day of June 2021.



_____
PAULA K. BARDEN, CCR, RPR, RMR #700
Federal Official Court Reporter
Western District of Arkansas